Argued June 18; decided July 22, 1895.

## FARMERS' LOAN COMPANY *v.* OREGON PACIFIC RAILROAD COMPANY.

[40 Pac. 1089.]

1. MODIFICATION OF DECREE.—Where the original decree for the sale of a railroad in a foreclosure proceeding directed the property to be sold as an entirety, for cash, and that so much of the price "as is not required to be paid in cash may be paid in receiver's certificates," it is not an essential modification to subsequently provide that the sale shall be made for United States gold coin only, for the failure to provide in the original order the proportion of the price to be paid in cash left the provision for the acceptance of receiver's certificates of no effect, and the entire price would have been required in cash under the original decree.

2. MODIFICATION OF DECREE.—An order directing that all taxes legally due and owing by a corporation up to a certain date shall be paid out of the purchase money realized from a sale under a prior decree of foreclosure of a trust deed upon the property of the corporation, and that all taxes levied against the property after such date shall be paid by the purchaser, does not alter or vary the essential parts of the original decree, which made no provision for the payment of taxes, so as to be in excess of the authority of the court, where the purchaser would be bound by law without an order to that effect to pay taxes accruing after that date.

3. POWER OF COURTS OVER FINAL DECREES.—A court having acquired jurisdiction to enter a final decree undoubtedly possesses the inherent right to subsequently modify both the time and manner of its enforcement, though the essential provisions of final decrees cannot afterward be changed.

4. RATIFICATION OF EXECUTION SALE.—A court has power to ratify the act of an officer in selling property at a time other than that fixed by a decree, where it might, in the first instance, have ordered a sale on that day.

5. EXECUTION SALE—INADEQUATE PRICE.—An inadequacy sufficient to set aside a public sale of property must be so gross as to shock the conscience, where there are no confidential relations existing between the parties, and no proof of fraud. Within the purview of this general rule the sale of the Oregon Pacific Railroad for one hundred thousand dollars, in December, eighteen hundred and ninety-four, was not a sale for such a grossly inadequate price as to require it to be set aside, so far as appears by the record.

Appeal from Benton: J. C. FULLERTON, Judge.

This is an appeal from an order confirming a sale of railway franchises and property on the foreclosure of a mortgage. The facts are that the plaintiff, having commenced a suit against the defendants, the Oregon Pacific Railroad Company and the Willamette Valley and Coast Railroad Company, to foreclose a mortgage given to secure the payment of bonds amounting to fifteen million dollars, a receiver was appointed, and on April twenty-seventh, eighteen hundred and ninety-one, the defendant companies having by their answers admitted the allegations of the complaint and supplement thereto, a decree was rendered as prayed for, wherein the mortgaged property was ordered sold by the sheriff of Benton County to the highest bidder for cash, without appraisement or right of redemption, and said officer was thereby directed to require of the bidder a deposit of not less than five thousand dollars in cash, to be applied in part payment of the purchase price, if the sale should be confirmed. On October twenty-third, eighteen hundred and ninety-one, the court made an order directing an execution to be issued, and instructing the sheriff to accept no bid less than one million dollars; of which sum twenty-five thousand dollars should be deposited before accepting any bid. An execution having been issued, the sheriff, on January twentieth, eighteen hundred and ninety-two, at a sale of the property, accepted the bid of Zephin Job of one million dollars, of which sum twenty-five thousand dollars was deposited with said officer, who reported the sale to the court, whereupon an order was made that upon the payment of nine hundred and seventy-five thousand dollars within thirty days the sale should be

confirmed; but the bidder having failed to make pay-
ment of such sum or any part thereof, the court, on
November seventeenth of that year, ordered a resale
of the property, and directed the sheriff to accept no
bid for a less sum than one million two hundred and
fifty thousand dollars, of which two hundred thousand
dollars was required to be deposited before any bid
could be accepted. A second execution having been
issued, the sheriff was unable to sell the property un-
der these terms, and by order of the court returned
the writ. On April tenth, eighteen hundred and
ninety-three, the court again ordered a resale of the
property, and directed the sheriff to require a deposit
of two hundred thousand dollars from the bidder be-
fore any bid should be accepted, and on December fif-
teenth of that year, another writ having been issued,
the sheriff accepted the bid of two hundred thousand
dollars from J. J. Beldon, Henry Martin, F. K. Pen-
dleton, S. S. Hollingsworth, Joseph Wharton, and James
K. Blair; but on the twenty-sixth of that month the
court, upon the officer's return of the writ, refused to
confirm the sale, and made an order setting it aside,
and directing the return of the deposit. On March
second, eighteen hundred and ninety-four, the court,
upon due notice to Zephin Job and the corporation to
whom he had assigned his right of purchase, made
an order setting aside the conditional confirmation of
the sale made upon his bid, directing a resale of the
property to the highest bidder for what it would bring
in cash, and instructing the sheriff to accept no bid
until two hundred thousand dollars had been depos-
ited with him by the bidder. Another execution hav-
ing been issued, the property was advertised to be
sold on June seventh, eighteen hundred and ninety-
four, but failing to receive any bid therefor, the offi-

cer returned the writ. On October twentieth, eighteen hundred and ninety-four, the court made another order directing a resale of the property on a day to be fixed by the sheriff, between the fifteenth and twenty-second days of December of that year, and instructing him to accept no bid until one hundred thousand dollars had been deposited; and a *pluries* writ having been issued, the said officer, after having duly advertised the property and received a deposit of one hundred thousand dollars, accepted a bid for that amount, and on the twenty-second day of December, eighteen hundred and ninety-four, sold, subject to confirmation, all the property and franchises of the defendant companies to E. L. Bonner and A. B. Hammond for said sum, and, on the twenty-sixth of said month, returned the writ. On January third, eighteen hundred and ninety-five, the bidders at said sale moved for an order of confirmation, while certain of the appellants, being either general creditors of the defendant corporations, or holding receiver's certificates, filed objections thereto, and on the nineteenth of that month other appellants filed objections to the confirmation, all which having been overruled, the court made an order confirming said sale, from which order this appeal is taken. AFFIRMED.

For appellants there were briefs by *Messrs. Watson and Elkins, Wallis Nash,* and *Bronaugh, McArthur, Fenton and Bronaugh,* with oral arguments by *Messrs. Wallis Nash, H. C. Watson, Earl C. Bronaugh,* and *William D. Fenton.*

The court below had no power to change, modify, or vary the original decree after the expiration of the term at which it was rendered: *Sibbald* v. *United States,* 37 U. S. 812; *Bank of United States* v. *Moss,* 47 U. S. 42;

*Bronson* v. *Schulten,* 104 U. S. 797; *Morgan's Louisiana and Texas Railway, etc., Company* v. *Texas Central Railway Company,* 32 Fed. 525; *Schell* v. *Dodge,* 107 U. S. 601; *Phillips* v. *Negley,* 107 U. S. 1013; *Trustees* v. *Greenough,* 105 U. S. 527; *Hume* v. *Bowie,* 148 U. S. 245; *Brewster* v. *Norfleet,* 22 S. W. 226; *Savannah* v. *Jesup,* 106 U. S. 563; *Miltenberger* v. *Logansport Railway Company,* 106 U. S. 286; *Trullinger* v. *Todd,* 5 Or. 36; *Williams* v. *Morgan,* 111 U. S. 684; *Deering* v. *Quivey,* 26 Or. 556.

Being final the court had no power to modify the decree: *Barrell* v. *Tilton,* 119 U. S. 637; *Huntington* v. *Little Rock Railway Company,* 16 Fed. 706.

In substantial matters it will be seen that the order of October, eighteen hundred and ninety-four, involves wide and substantial departures from the decree of April, eighteen hundred and ninety-one. The original decree looked to a reconstruction or reorganization of the company. It gave powers to holders of receiver's certificates to bid their securities as part of the purchase money at the sale, and to bondholders to bid their bonds and coupons at such rate and percentage as should be returnable to them from the ultimate proceeds of sale, the deposit of five thousand dollars being reserved to be paid in cash. The bondholders and receiver's certificate holders are both eliminated from the order of sale of October twentieth, eighteen hundred and ninety-four, which is to be for cash to the highest bidder; the purchase money, including the deposit of one hundred thousand dollars, being to be paid in cash or its equivalent in certified checks or drafts satisfactory to the sheriff and to the court, and not otherwise. The result of such an order is apparent in a sale of property

valued by hostile experts not much more than two years ago at not less than three million dollars for one hundred thousand dollars. That the bondholders had an equitable right to apply their bonds toward the payment of the purchase money, after satisfying the costs and charges of the litigation and trust, was decided in *Duncan* v. *Mobile and Ohio Railway Company,* 3 Woods, 597.

The effect of the provision in the decree of April, eighteen hundred and ninety-one, for the benefit of the bondholders and certificate holders was two fold; it enhanced the value of their securities by permitting their use as cash in the purchase of the road, and also induced a corresponding reduction of the indebtedness of the court, diminished *pro tanto* the amount of cash required to clear off the labor and material indebtedness of the court through its receivers, and forestalled and prevented the litigation between lien holders, certificate holders, preferred creditors, and labor and material claimants, which is inevitable in the proposed distribution of the almost ridiculous sum which will remain from the one hundred thousand dollars, when the costs and expenses of the court, and the amount allowed for taxes, have been first deducted therefrom: *Kneeland* v. *American Loan and Trust Company,* 136 U. S. 89; *Farmers' Loan and Trust Company* v. *Texas Central Railway Company,* 129 U. S. 206; *Jerome* v. *McCarter,* 94 U. S. 734; *Kneeland* v. *Luce,* 141 U. S. 508; *Wallace* v. *Loomis,* 111 U. S. 776; *Kennedy* v. *St. Paul and Pacific Railway Company,* 2 Dill. 448; *Stanton* v. *Alabama and Chattanooga Railway Company,* 2 Woods, 506; *Bank of Montreal* v. *Chicago, Clinton and Western Railway Company,* 48 Iowa, 518; *Coe* v. *New Jersey Midland Railway Company,* 27 N. J. Eq. 37; *Hoover* v. *Montclair, etc., Company,* 29 N. J. Eq. 4; *Meyer* v. *Johnston,* 53 Ala. 237.

Receiver's certificates are the creations of American courts. They are securities sui generis, brought into use by the courts to enable them to preserve property in their custody, and the faith of the court which issues them is pledged for their redemption. The propriety of their issuance has been repeatedly upheld by the United States supreme and circuit courts, as well as by the state courts: *Kneeland* v. *Luce,* 141 U. S. 508; *Jerome* v. *Carter,* 94 U. S. 734; *Wallace* v. *Loomis,* 111 U. S. 776; *Kennedy* v. *St. Paul and Pacific Railroad Company,* 2 Dill. 448; *Stanton* v. *Alabama and Chattanooga Railroad Company,* 2 Woods, 506; *Bank of Montreal* v. *Chicago, Clinton, and Western Railroad Company,* 48 Iowa, 518; *Coe* v. *New Jersey Midland Railway Company,* 27 N. J. Eq. 37; *Hoover* v. *Montclair, etc., Railroad Company,* 29 N. J. Eq. 4; *Meyer* v. *Johnston,* 53 Ala. 237.

It has been recognized in every case which has come under our notice, that it is the duty of the court to keep faith with its creditors, and to retain possession of the property until their debts are paid or provided for. In those cases wherein railroads have been sold for less than sufficient to pay the court's indebtedness, such sales have been confirmed only on one of two conditions, either that the court's creditors have taken part in the sale and purchase, (by virtue of an agreement of reorganization,) or the court has stipulated with the purchasers to assume any balance of the court's indebtedness: *Farmer's Loan and Trust Company* v. *Central Railroad Company,* 17 Fed. 758; *Jessup* v. *Wabash, St. Louis and Pacific Railroad Company,* 44 Fed. 663; *Mercantile Trust Company* v. *Kanawha and Oswego Railway Company,* 50 Fed. 874; *Shaw* v. *Little Rock Railroad Company,* 100 U. S. 605; *Robinson* v. *Philadelphia and Railroad Company,* 28 Fed. 340; *Kitchen* v. *St. Louis Railroad Company,* 69 Mo. 224; *Gates* v. *Boston and New*

*York Railroad Company,* 53 Conn. 350; *Canada Southern Railway Company* v. *Gebhard,* 109 U. S. 539; *Shaw* v. *Little Rock Railroad Company,* 100 U. S. 612; *Twin Lick Oil Company* v. *Marburg,* 91 U. S. 591.

It was the duty of the court to encourage and effect some plan of reorganization by which the holders of its certificates would have been protected. In the case before the court one plan of reorganization was submitted by the bondholders, acting through a committee, at the close of eighteen hundred and ninety-one. From dissentions among the bondholders apparent in all the subsequent proceedings before the court, and on the abstract of record, the first plan failed after repeated adjournments, and a most serious lapse of time. When this state of affairs was disclosed, the fatal order was made by the court to sell the property for what it would fetch in cash, little foreseeing the catastrophe to which it inevitably led. No provision was made, or suggested, for any of the creditors of the court. Anxiety to get rid as speedily as possible of the burden of the suit and its appendage, the receivership, appears in the repeated efforts at a sale on these terms. The result is seen in the attempted confirmation of a sale of property, reasonably worth three million dollars, even in bad times and under depressed conditions, for one hundred thousand dollars. Examination of the very numerous cases which have come before the courts during the past ten or fifteen years has failed to find one distantly resembling this. The anxiety of the court to protect its creditors should have been still further stimulated by the consideration that the security of these lenders depended solely on its action. If the court fails the certificate holder, and the sale being in other respects legally made, is confirmed without provision for him

in one form or another, the balance of authority appears to leave him without remedy. For in such case he is bound by the decree: *Mercantile Trust Company* v. *Kanawha and Oswego Railway Company,* 58 Fed. 6; *Gordon* v. *Newman,* 62 Fed. 689; Beach on Receivers, 332.

The property was sold for such a grossly inadequate price that it clearly shows a want of good faith; indeed, a deliberate attempt to defraud. The property sold comprises a railroad, laid with steel rails of fifty and fifty-six pounds to the yard, operated for one hundred and thirty miles, and with a very large quantity of partially constructed road, which will reduce to a very low figure the cost of completing and opening the next sixty miles through the remaining part of the Cascade Mountains, and to the Des Chutes River; a telegraph line and instruments, operating the one hundred and thirty miles; sixteen locomotive engines, upwards of three hundred freight cars, seven passenger coaches, and four baggage cars and postoffice cars; three river steamboats on the Willamette River, which cost fifty-seven thousand dollars; a valuable tugboat on Yaquina Bay; tools and machinery in the shops at Yaquina, costing about fifteen thousand dollars; a complete engineering outfit of instruments for four or five parties; hoisting engines, and a large quantity of miscellaneous property; usual and adequate office furniture and fittings. So that it is in no sense an exaggerated statement that the court might have sold off movable property to the value of over twice the whole amount of the purchase money bid by Messrs. Bonner and Hammond, and have had enough rolling stock and outfit left to operate the railroad, and have reserved the railroad itself intact. The bare recital of the facts is surely enough. It is submitted that the books may be searched in vain to

find—not a parallel—but an instance of "inadequacy of price" even distantly resembling that now before the court: *Hume* v. *United States*, 21 Ct. of Cl. 328; *Boyd* v. *Ellis*, 11 Iowa, 97; *Herron* v. *Herron*, 71 Iowa, 428; *Horsey* v. *Hough*, 38 Md. 130; *Maquisson* v. *Williams*, 111 Ill. 450; *Hoyt* v. *Pawtucket Savings Institution*, 110 Ill. 300; *Latch* v. *Furlong*, 12 Grants Ch. (Ont.), 393; *Vail* v. *Jacobs*, 62 Mo. 130; *Meyer* v. *Jefferson Insurance Company*, 5 Mo. App. 245.

A consensus of decision shows that a sale on the twenty-second of December is not a sale between the fifteenth and twenty-second. Both limits are excluded: *Richardson* v. *Ford*, 14 Ill. 333; *Bunce* v. *Reed*, 16 Barb. (N. Y.), 352; *Fowler* v. *Rigney*, 5 All. Pr. (N. S.), 182; *Atkins* v. *Boylston Insurance Company*, 5 Metc. (Mass.), 439; *Kendall* v. *Kinsley*, 120 Mass. 95; *Cook* v. *Gray*, 6 Ind. 335; *Robinson* v. *Foster*, 12 Iowa, 186.

*Messrs. Turner, McClure and Ralston, John R. Bryson, James K. Weatherford, P. H. D'Arcy and Geo. G. Bingham, Percy R. Kelly*, and *W. S. McFadden*, were attorneys for respondents, and oral arguments were made by *Messrs. Bryson, Bingham*, and *McFadden*.

The only brief filed for respondents was by *Mr. McFadden*, representing Bonner and Hammond (the purchasers of the road), from which brief a few extracts are here given.

A decree of confirmation cures all irregularities: *Challiss* v. *Wise*, 2 Kan. 193; *Koehler* v. *Ball*, 2 Kan. 160 (83 Am. Dec. 451); *Wills* v. *Chandler*, 2 Fed. 273; *Townsend* v. *Tallant*, 33 Cal. 45 (91 Am. Dec. 617); *O'Brien* v. *Garlin*, 20 Neb. 347; *McCullough* v. *Chapman*, 58 Ala. 325; *Wilkerson* v. *Allen*, 67 Mo. 502; *Neligh* v. *Keen*, 20 N. W. 277; *Leinenweber* v. *Brown*, 24 Or. 548; *McKugha* v. *Hop-*

*kins,* 26 N. W. 614; *Morrow* v. *Weed,* 4 Iowa, 77 (66 Am. Dec. 122); *Woodhull* v. *Little,* 102 N. Y. 165; *Cooley* v. *Wilson,* 42 Iowa, 428.

Inadequacy of price is not of itself sufficient ground for setting aside a sale. Evidence of irregularity to the injury of the parties interested must be clear and conclusive before a court will interfere and set aside a sale. The mere inadequacy of price is not a sufficient ground to set aside a judicial sale, unless it be so great as to shock the conscience of the court and raise the inference of unfairness, fraud, mistake, or surprise; and a resale will not be ordered, as a general rule, upon an offer to increase the price brought at the sale, without the support of special circumstances: Jones on Corporations, Bonds, and Mortgages (2 ed.), § 662; *Wesson* v. *Chapman,* 76 Hun, 592 (28 N. Y. 192); Freeman on Executions, § 289; *Weaver* v. *Nugent,* 13 Am. St. 792; *Stockmeyer* v. *Tobin,* 139 U. S. 176 at page 196; *Brittin* v. *Handy,* 73 Am. Dec. 497; *Central Transportation Company of New York* v. *Sheffield and Birmingham Coal and Iron Company,* 60 Fed. 9; *Lake Superior Iron Company* v. *Brown, Bonnell and Company,* 44 Fed. 539; *Harris* v. *Ruby,* 38 Fed. 622; *Herman* v. *Copeland,* 17 S. E. 482; *Blackburn* v. *Selma Railway Company,* 3 Fed. 689.

After confirmation a judicial sale will not be set aside except for fraud, surprise, or other cause, for which equity would relieve in case of sale by parties: *Berlin* v. *Melthorn,* 75 Va. 639; *Virginia Fire Insurance Company* v. *Cottell,* 85 Va. 857; *Huston* v. *Aycock,* 73 Am. Dec. 131; *Williamson* v. *Berry,* 8 How. 495; *Brewer* v. *Herbert,* 96 Am. Dec. 582; *Hart* v. *Burch,* 130 Ill. 427; *Morrow* v. *McGreeger,* 49 Ark. 67; *Todd* v. *Gallego Mills Manufacturing Company,* 84 Va. 586; Freeman on Execu-

tions, §§ 305–310; *Karns* v. *Rorer Iron Company* (Va.), 11 S. E. 431; *Page* v. *Kress* (Mich.), 44 N. W. 1052.

The court may ratify various irregularities in the proceedings, the principle being that a subsequent ratification is equivalent to a previous authorization: *Allison* v. *Allison*, 13 S. E. 549; *Crosby* v. *Kiest*, 135 Ill. 458; *Huckins* v. *Kapf*, 14 S. W. 1016; *Stockmerger* v. *Tobin*, 139 U. S. 176; *Wetmore* v. *St. Paul and Pacific Railroad Company*, 3 Fed. 177; *Driscoll* v. *Morris*, 21 S. W. 629; *Max Moran* v. *Clark*, 8 Am. St. 66; *Watson* v. *Tromble*, 50 N. W. 331; *State National Bank* v. *Neel*, 22 Am. St. 185; *Camden* v. *Mayew*, 129 U. S. 73; *Hartley* v. *Roffe*, 12 W. Va. 401; *Leadville Coal Company* v. *McCreery*, 141 U. S. 475; *Baty* v. *Veon*, 18 W. V. 291; *Wills* v. *Chandler*, 2 Fed. 273; *Jennings* v. *Carson*, 4 Cranch, 2; *Trimble* v. *Herold*, 20 W. Va. 602.

The proposition that before a court can make an order of sale under the authority reserved in an original decree it must notify and have before it the holders of receivers' certificates, and all persons laboring or furnishing material for the receivership, announced in appellants brief, is very extraordinary. It is so refreshingly new. And, if correct in principal, what a limitless field for litigation it will open up for the legal profession. Each little railroad receivership may count its parties litigant by the thousand and our transcontinental receiverships theirs by the ten thousand. What a pageant to the eyes of us worldly-minded lawyers. Ten thousand suitors in one case with ten thousand retained lawyers, counselors, and barristers. What a happy solution of the labor question. The overcrowded avocations of life will be relieved. The law will offer untold opportunities. Courts, officers, sheriffs, bailiffs, clerks, and criers will increase, and no man need be without an office. The thoughts of it all makes one almost delirious

with impatience.  Surely, if this is not the law, its ju-
dicial enactment would greatly subserve the legal pro-
fession.  Why should we look backward for a prece-
dent?  Counsel for appellants rise above the narrow
confines of adjudicated cases, and must the court plod
while they soar?

The authorities cited by counsel to the effect that
a final decree cannot be changed or modified meet our
approval, and we yield ready assent to the proposi-
tion.  We hold, however, that courts of equity may
reserve the power to control the manner of enforce-
ment of their decrees, and that such power was re-
served by the court in this case.  The questions
raised and authorities cited in reference to the duties
of the court to protect the holders of receivers' certi-
ficates must be viewed and read by the light of the
conditions, surroundings, and history of this case in
order to decide upon their applicability.  Abstractly,
the authorities are well enough.  The facts and his-
tory of the case, however, do not admit of their appli-
cation.

So far as the suggestion goes that the court con-
tinue the receivership until it can itself go out and
effect a reorganization plan and have the same car-
ried out, we confess to an inablity to accede to the
views of appellant's counsel; and the authorities cited
have failed to carry conviction to our minds that such
a plan is feasible or legal.  Courts no doubt will, as
stated in some cases cited, recognize equitable and
proper reorganization schemes provided and arranged
for by creditors and bondholders.  But a court cer-
tainly will not actively promote or arrange reorganiz-
ation plans.  Suppose, however, the court should at-
tempt a thing so utterly absurd, how is it to require
creditors or bondholders to carry it out?  It will be

observed that by the terms of the original decree the mortgaged property must be sold as entirety and for cash, and then follows this clause: "So much of the purchase money as is not required to be paid in cash may be paid in receivers' certificates authorized by the court, and in overdue bonds, interest coupons of bonds secured by the mortgage in question, at such rate and percentage as the holder would be entitled to receive in respect of such bonds and coupons out of the purchase money and proceeds of the sale, as the same may be ascertained. If any question should arise as to the rate or amount of such dividend and percentage, or as to the proportion to be paid in cash and the proportion that may be paid in such bonds and coupons, application may be made to the court from time to time at the foot of the decree." What is the clear and obvious meaning of this language in the decree? Does it convey the idea claimed for it by appellant's counsel, that holders of receiver's certificates, or overdue bonds, or interest coupons could, under the decree, bid their securities at the sale? Bid receiver's certificates, or bonds at a judicial sale! Most extraordinary proposition. Suppose the certificates are only worth ten cents on the dollar. Is the holder of them to stand up and bid certificates against a cash bidder? Or, suppose the bonds are entirely worthless, as they are, are bondholders at the sale to have the privilege of bidding these bonds against holders of receiver's certificates which are worth ten cents on the dollar, and even against a cash bidder? If this construction can obtain there is no doubt but what the property will, at a new sale, bring a much better price in bonds and receiver's certificates. The difficulty will be in getting the court's creditors to receive them in payment of the court's debts. It

must be apparent, to every one who reads, that the decree contemplated nothing but a cash sale, giving, however, to the purchaser the privilege of using any of these securities in paying the amount of his bid, just so far as such securities would be entitled to participate in the cash realized at such sale. No other construction can be given to the language of the decree without doing violence to its terms, and stultifying the court that rendered it. It seems inexplicable that the proviso as to bonds, certificates, etc., predicated wholly on possible "futures," as to prospective values thereof, as the same may be ascertained in the distant future, poetically styled, "The sweet by and by," should so bewilder the imagination of appellants. Is this court to grasp at phantasies — ethereal essences, fanned into existence by the wand of the versatile counsel who for years has stood over the tomb of the defendant corporations chanting requiems to the glory of the departed? It was Moses, who, at the murmurings of the Israelites, smote Horeb's rock and made water to flow to slake the thirst of the famishing multitude, and the appellants ask the court in some incomprehensible way to resolve itself into a money center and precipitate cash into the pockets of certificate and bondholders. They signally fail to blaze out the highway to the bonanza fields for the court's occupancy.

The circuit court has been weighed down with this receivership and the operating of the defendant companies since the evening of the twenty-eight of October, eighteen hundred and ninety. Even the letters "O. P. R." and "W. V. and C. R." have hung over the court below an ever-present and veritable nightmare. Every conceivable expedient known to the law has been adopted by the court to relieve itself from this

incubus. Five different modifications as to the enforce-
ment of the decree, after much consideration, have
been judicially promulgated to the world to induce bid-
ders to purchase this combined railroad plant. Time
and again have the properties and franchises of these
defunct corporations been duly advertised for public
sale. Printers' ink has been repeatedly spread from
Oregon to New York City, announcing boldly to the
public that the sheriff of Benton County would appear
at the front door of the courthouse and sell at pub-
lic auction this property under the decree of the
court, and, in at least seven instances, that sheriff,
for want of bidders, was compelled to · postpone the
sale from time to time. Since December of eighteen
hundred and ninety-one, these efforts to unload the
court's embargo have been most vigorous and con-
tinuous. So much so, that the court seemed resolved
into a kind of perpetual supplicant to the railroad
world at large for assistance out of the operating
dilemma.

Two receivers have been born and have lived and
died during the operating period of this concern, and
the third and last, an example of the survival of the
fittest, has barely survived, and faintly answers to
rollcall. Nor has the court struggled alone and un-
aided in the premises. By no means! Ninety-seven
different attorneys, learned and unlearned, have ad-
ministered the balm of consolation to the patient in
doses to soothe, if not relieve, at "upset figures."
To keep pace with this moving procession, the court
has been practically in adjourned session for the past
four years. The live coals on the altar of justice
have been constantly fanned to meet the ever-recur-
ring exigencies, superinduced by the "operating proc-
ess." In a word, the record discloses the fact to be

that the "corpus" has been treated from every conceivable standpoint, allopathic, homeopathic, and eclectic; but all to no purpose.   It was Burke who said "What shadows we are, and what shadows we pursue," but it has been left to the ingenuity of appellants by long and close contact with a "going concern" to attempt the rare expedient of reducing shadow to substance, and erecting an ideal superstructure thereon.   Unfortunately, the blissful dreams of bountiful rewards as appertains to Oregon Pacific certificates is not to be realized in this present evil world.   No judicial power, as now organized, is gifted with divination, and no earthly tribunal can speak the dead into life.   Even the roadbed, structures, and betterments of the defendant companies have reached the stage of actual decay.   Desolation and ruin are everywhere manifest from the Yaquina terminus to Breitenbush in the Cascades.   The court, certificate holders, and all concerned, are, under the appellants' contention, reduced to the position of the unfortunate pitcher, in Sancho Panza's aphorism, viz., "Whether the pitcher hits the stone, or the stone hits the pitcher, it goes ill with the pitcher."   Let the certificate holders therefore be content with their present forlorn condition — *la fortune passe partout.*

Opinion by MR. JUSTICE MOORE.

The respondents contend that because the defendant companies have admitted in their answers that they were insolvent, and that the value of their property and franchises was insufficient to meet the payment of the bonds and overdue interest coupons secured by the mortgage, and because no decree has been rendered against them for any deficiency after

the sale of their property, and because they have not made any objections to the confirmation of the sale, they have no appealable interest, and are estopped by the order of confirmation; that none of the other appellants ever intervened in the court below, or became parties to the record; that Sanford Bennett, E. C. McShane, and Bronaugh, McArthur, Fenton, and Bronaugh are the only persons or firms who filed any objections to the confirmation of this sale within the time prescribed by law; that the appellants have no unity of interest, and that Bronaugh, McArthur, Fenton, and Bronaugh have not taken a cross-appeal. Without considering the respondents' objections, but assuming that the appellants are parties to the record and properly before the court, we will examine the case upon the merits as presented by the record.

1. The appellants contend that the amount bid for the property and franchises was so grossly disproportionate to its value as to render the order of confirmation an abuse of discretion, and, while not expecting the court to set the sale aside on account of inadequacy of the price alone, they insist that some excuse should be found for avoiding the effect of the bid in such cases, and suggest as an additional reason therefor that the court had no jurisdiction or authority at a subsequent term to modify or vary the provisions of the original decree; while the respondents, admitting the legal proposition contended for, insist that the subsequent orders of the court did not modify or vary the original decree, but only prescribed the terms of its enforcement, and that the right to do so is inherent in the court, and was specially reserved in the decree. Assuming, for the sake of argument, that the amount bid was inadequate, we will examine the

original decree and the order of the court of October twentieth, eighteen hundred and ninety-four, with reference to the right of a purchaser to tender in part payment of the purchase price receivers' certificates as cash, this being the particular modification of which the appellants complain. The original decree, after providing that the mortgaged property should be sold as an entirety for cash and without appraisement or right of redemption, further directs that "so much of the purchase price as is not required to be paid in cash may be paid in receivers' certificates, and in bonds, overdue interest coupon bonds, at such rate and percentage as the holder would be entitled to receive in respect of such bonds and coupons out of the purchase money and proceeds of sale, as the same may be ascertained. If any question should arise as to the sale and amount of such dividend and percentage, or as to the proportion to be paid in cash and the proportion that may be paid in such bonds and coupons, application (for that purpose) may be made to the court from time to time." The sentence last quoted makes no provision for ascertaining what proportion of the purchase price may be paid in receivers' certificates, but the preceding sentence, having provided that so much of it as is not required to be paid in cash may be paid in certificates, bonds, and coupons, places the certificates in the same class with the other evidence of indebtedness, and limits the right of a bidder to tender them in payment of that part of the purchase price not required by the court to be paid in cash. It also required a bidder to deposit the sum of five thousand dollars as an earnest of his good faith and ability to comply with the terms of his offer to purchase, but it did not prescribe what sum should be paid in cash, and hence, in the absence

of such a provision, the whole purchase price could be paid only in that manner. If the sale had been made under the original decree, without any application to the court to prescribe what amount of the purchase price should be paid in cash, can it be successfully contended that the purchaser could have tendered either receivers' certificates, bonds, or interest coupons in payment of any part of it? Had the court, on the application of the parties, fixed the amount of the purchase price, less than the whole, which was to have been paid in cash, then the certificates would have been receivable at their face value in liquidation of that part of it not so payable, for the decree made provision for receiving the bonds and coupons only at such rate and percentage as the holders thereof might be entitled to out of the purchase price, and made no reference to the certificates. The order of October twentieth, eighteen hundred and ninety-four, provided that such sale should be made for cash in United States gold coin; and it was contended at the argument that, since the receivers' certificates were not payable in like coin, they could not be received in payment of any part of the purchase price, and hence this order substantially modified the original decree. It is sufficient to say that, had they been payable in United States gold coin, they would not have been receivable in payment of any part of the purchase price until the court had prescribed what part, less than the whole, should be paid in coin.

2. The order of October twentieth, eighteen hundred and ninety-four, also provided that "All taxes legally due and owing by the defendant companies up to the thirty-first day of March, eighteen hundred and ninety-four, shall be paid out of the purchase money

realized from such sale, by and under the order of this court, and all taxes levied against such properties and franchises after the thirty-first day of March, eighteen hundred and ninety-four, shall be borne and paid by the purchaser or purchasers at such sale." It is contended that the order providing for the payment of the taxes levied on the property of the defendant companies prior to March thirty-first, eighteen hundred and ninety-four, substantially modified the original decree, and prejudged the rights of the lienholders without having given them an opportunity to question the validity of such taxes; and that the portion thereof requiring the purchaser to pay the taxes levied after that date was invalid, and tended to reduce the amount of the purchaser's bid to the extent of the unascertained tax. We cannot think, from an examination of the order, that the court intended thereby to determine the question of priority of right to the fund which was to be realized from the sale of the property. The record shows that the counties of Benton, Lincoln, Linn, and Marion, upon their petitions to the court, obtained an order directing the receiver to pay the taxes due them from the defendant companies, which, in effect, transferred the rights which the said counties had in the property situated within their respective limits to the fund to be realized from its sale, which fund was to be applied to the payment of these taxes "by and under the order of the court." The court, in the order complained of, did not find what amount of tax, if any, was due either county, or attempt to establish a prior or any lien in favor of the said counties. It, in effect, provided that the fund realized from the sale should stand in the place of the property, and, upon settlement, be distributed among those having a prior right

to it. If the counties had no prior lien on the property for the payment of the delinquent taxes, they could have no prior claim on the fund to be realized from its sale. How could the appellants be injured by this order? If any one had cause to complain, it would be the said counties, and particularly so if the fund was insufficient to pay the delinquent taxes, but they have made no objection to the provisions imposed, with which they are presumably satisfied. While the requirement that the purchaser should pay all taxes levied on the property after March thirty-first, eighteen hundred and ninety-four, may have had the effect to reduce the amount of his bid, it was not in our judgment invalid, for if the sale had been consummated prior to the issue of the warrant for the collection of the taxes of that year, and no agreement had been entered into in reference to their payment, it would have been the duty of the purchaser to pay them: Hill's Code, § 2846. The trial court, in fixing the day of sale not later than December twenty-second, was doubtless aware that it would be impossible for the state board of equalization to complete its examination of the county assessment rolls, and certify the result to the several county clerks, in time to have the tax rolls completed and warrants issued for the collection of the taxes until after that date, and we can see no injury resulting from the court's order calling the purchaser's attention to the provisions of the statute in relation to his duty to pay the taxes of eighteen hundred and ninety-four.

3. The court acquired jurisdiction of the subject matter of the suit by virtue of the constitution and statutes of the state, and of the persons of the de-

fendant companies by their several answers admitting the allegations of the original and supplemental complaints; and the court, having found the amount due from the defendants to the plaintiff, and that this sum was secured by a deed of trust, foreclosed the same, and ordered a sale of the mortgaged property, and, having had jurisdiction of the subject matter and persons of the defendant companies, its decree was final and fully supports the sale of the defendants' property, unless it has been modified by the subsequent orders of the court. Mr. Beach, in his valuable work on Modern Equity Practice, (section 905,) in speaking of the power of a court to control the execution of its decree, says: "Notwithstanding the general rule that the court has no power whatever, after final decree, to amend, modify, or alter the proofs of the decree, it retains and possesses the power of controlling the time of its execution." The authorities cited in support of the text are: *Bound* v. *South Carolina Railway Company*, 55 Fed. 186; *Monkhouse* v. *Corporation*, 17 Ves. 380; *Edwards* v. *Cunliffe*, 1 Madd. 287; *Spann* v. *Spann*, 2 Hill's Ch. Pr. 122. In the *Bound Case,* 55 Fed. 186, the decree ordered the sale of a railroad to be made on April eleventh, eighteen hundred and ninety-three, and, an appeal having been taken in which no supersedeas bond was given, the court, on motion, after adopting the language quoted in the text, postponed the sale to December twelfth of that year. In *Monkhouse* v. *Corporation*, 17 Ves. 380, the plaintiff having obtained a decree foreclosing a mortgage, the defendant moved the court to suspend its execution until six months after an appeal could be heard, which motion was allowed upon condition that the defendant pay the interest and costs, upon plaintiff's undertaking to repay the same, if the decree should be reversed. In

*Edwards* v. *Cunliffe*, 1 Madd. 287, the decree provided that unless the amount due was paid on December twenty-third, eighteen hundred and fourteen, the mortgage foreclosure should become absolute, but the mortgagor, being unable to comply with the terms, the date of payment was, upon motion, extended four times. So, too, in *Spann* v. *Spann*, 2 Hill's Ch. Pr. 122, Johnson, J. in delivering the opinion of the court upon this question, said: "But it is equally clear that the courts, both of law and equity, or a judge or chancellor at chambers, have the power, and daily exercise it, of suspending the execution of even final process on account of subsequent matter which would render the execution of it oppressive or iniquitous." These authorities clearly support the text of the learned author, and conclusively show that, while a court cannot, by a subsequent order, modify the essential features of a final decree, it does possess the inherent right of changing the time of its execution. This right being granted, it must, upon principle, be conceded that a court possesses an equal right to modify by a subsequent order the manner of the enforcement of its decrees, for it requires no more power to modify the manner than it does to change the time of executing them. In *Turner* v. *Indianapolis, Bloomington, and Western Railway Company*, 8 Bissell, 380, (Fed. Cas. 14259,) Mr. Justice Drummond, in commenting on the modification of a decree by a subsequent order, said: "The facts were that the original decree was entered on the eighteenth of July, eighteen hundred and seventy-seven, and the amendment was made in May, eighteen hundred and seventy-eight. I admit the rule which denies the power of the court over a decree after the term when it was rendered. It can not change or alter the essential parts of the decree.

But what was the order made by the court in May, eighteen hundred and seventy - eight? It is termed a further direction for the execution of the decree theretofore entered. The original decree provided that the property should be sold on a certain number of days' publication. That was changed by the amendment. The original decree provided for the distribution of the funds arising from the sale in a particular manner. That was changed by the amendment of May, eighteen hundred and seventy-eight. But these things did not affect the substance · of the decree. Of the right of the court to make that order, I cannot doubt." This case was appealed to the Supreme Court of the United States, where Mr. Justice HAR-LAN, in rendering the decision upon review of the foregoing objection, with others, said: "We do not stop to consider whether these objections find any support in the record, since it is sufficient to say that, if any such errors exist, they necessarily inhere, some in ·the final decree of foreclosure and sale, and others in the order which preceded it. They cannot be examined upon an appeal merely from the order confirming the report of sale. Our authority extends, as we have shown, no further than to an examination of the exceptions filed by appellants to the report of sale, from the order confirming which this appeal is taken. And some of these exceptions plainly have reference, not to the sale itself, but to the final decree of foreclosure; such, for instance, as that the terms of sale were too onerous; that the property was sold subject to various claims, the amount of which was wholly uncertain; and that the court had no jurisdiction in the case": *Turner* v. *Farmers' Loan and Trust Company*, 106 U. S. 522 (1 Sup. Ct. 519). The modifications complained of do not, in our judgment,

alter or vary the essential parts of the original de-
cree, and were such as the court had authority to
make in carrying it into execution.

4. We will now examine the objections to the con-
firmation. It is contended that the court having in-
structed the sheriff to sell the property between the
fifteenth and twenty-second days of December, eigh-
teen hundred and ninety-four, that officer had no
license to sell on either of said days, and hence a sale
by him on the twenty-second of that month was void.
However this may be, the court has ratified the acts
of its agent, and confirmed the sale. "The court,"
says Mr. Freeman in his work on Void Judicial Sales,
(section 42,) "may, if it deems best, ratify various irreg-
ularities in the proceedings. If the officer changed the
terms of the sale, the court may ratify his action, pro-
vided the terms, as changed, are such as the court had
power to impose in the first instance." The court in
such cases may do by indirection what it could do
directly, and, since it could have ordered the sale on
the day it occurred, it had power to ratify the act of
the officer, if it be conceded that he exceeded his au-
thority by selling the property on the day named:
*Jacobs' Appeal,* 23 Pa. St. 477; *Emeroy* v. *Vroman,* 19 Wis.
*689 (88 Am. Dec. 726); *Thorn* v. *Ingram,* 25 Ark. 58.

5. The most important contention is that the prop-
erty and franchises offered for sale were of the value
of three million dollars; that the rails, rolling stock,
and miscellaneous property alone,—not including the
land or buildings,—were worth four hundred and fifty
thousand dollars; and that the bid of one hundred
thousand dollars is so grossly inadequate as to shock
the conscience, and raise the inference of unfairness,

fraud, mistake, or surprise. "The uniform current of the authorities," says the court in *Marlatt* v. *Warwick,* 18 N. J. Eq. 108, "settles that mere inadequacy of price, where parties stand on an equal footing, and there are no confidential relations between them, is not of itself sufficient to set aside a sale, unless the inadequacy is so gross as to be proof of fraud, or to shock the judgment and the conscience." In the case at bar it is not claimed that the parties did not stand on an equal footing, that there were any confidential relations existing between them, or that there is any proof of fraud, and hence the inadequacy sufficient to set aside the sale must be so gross as to shock the conscience. We have examined the transcript before us in vain to find any evidence of the value of the said property and franchises. The receiver, upon his appointment, made an inventory of all that came to his possession, but he does not appraise a single article, or give the value in gross, except of some unused material on hand. There was no evidence before the trial court of the value, and it would be extremely difficult for us to conclude that the bid was inadequate until we have some evidence upon which the conclusion can be based. It is said that some experts were appointed by a committee of the bondholders to examine the property and appraise its value, but we cannot find that they were ever appointed by or made a report to the court upon this important subject. It does appear, however, from the report of J. W. Whalley, Esq., who was appointed referee to take an account of the receipts and expenses of the defendant companies under the receivers' management, that for a period of about fourteen months prior to January first, eighteen hundred and ninety-two, the lines of railroad and the river and ocean steamers connected

therewith had been operated at a total loss of eighty-seven thousand nine hundred and eighty-three dollars and seventy-five cents, or six thousand two hundred and eighty-four dollars and fifty-five cents per month; that the receiver had prior to said date issued certificates amounting to six hundred and thirty-eight thousand and forty-one dollars and twenty-nine cents, and that the total liabilities on June thirtieth, eighteen hundred and ninety-two, were nine hundred and five thousand four hundred and fourteen dollars and forty cents, less thirty-seven thousand eight hundred and thirty-six dollars and eighty-six cents, which was available in part payment of that amount, thus showing a total indebtedness at that date of eight hundred and sixty-seven thousand five hundred and seventy-eight dollars and fifty-four cents beyond the bonded indebtedness of fifteen million dollars and interest which were secured by the mortgage. How much this debt was increased from June thirtieth, eighteen hundred and ninety-two, at which time the referee made his supplemental report, to December twenty-second, eighteen hundred and ninety-four, when the sale occurred, the record does not show, but it was admitted in argument that an indebtedness of more than one million dollars had been incurred by the receiver since his appointment on October twenty-eighth, eighteen hundred and ninety. Viewed in the light of a business venture, and not considering the amount necessary to be expended for betterments, a property which was operated as a "going concern" at a total loss of more than six thousand dollars per month, does not, it must be conceded, present a very inviting field to capitalists, and while the amount bid for the property may be grossly inadequate, we cannot say that it is so, in the absence of any evidence of its value, and

considering that no sum in excess of that amount has been offered by any one. It is indeed unfortunate that the expenses of the management of the property can not be realized from its sale. No one can examine the record before us without being impressed with the conviction that the trial court has labored long and earnestly to accomplish this result, but without success, and to continue the operation of the road under the management of a receiver would result in further expense which must be borne by those who can ill afford to add it to their present losses. The court, hoping the bondholders would by reorganization buy the property and pay off the expense of the receiver's management, fixed a minimum price of one million dollars, and at another time one million two hundred and fifty thousand dollars, but was unable to effect a sale on these terms, and after waiting more than four years for the consummation of its hopes found the illusion dispelled, and the only remedy remaining was to sell the property for what it would bring, which, having been done, amd the sale confirmed by a court that was acquainted with the property and must have known its value, we can, in the absence of any evidence of the value, do nothing more than affirm the decree, which is so ordered.          AFFIRMED.