## MOOTRY v. GRAYSON.

### (Circuit Court of Appeals, Ninth Circuit.   October 1, 1900.)

### No. 593.

1. EQUITY—POWER OF COURT TO MODIFY DECREE—MANNER OF ENFORCEMENT.
   While a court of equity is without power to modify a final decree after the term at which it is entered, in so far as it determines the rights of the parties, it retains jurisdiction to make further orders directing the manner of its execution, and to that extent it may modify the provisions of the original decree, as by changing the time or terms of a sale of property necessary to carry a decree of partition into effect.

2. DECREE—JURISDICTION—COLLATERAL ATTACK.
   Where no lack of jurisdiction over the subject-matter or the parties appears upon the face of a decree modifying the terms of a former decree as to the conditions of a sale of property to be made thereunder, objections to the jurisdiction of the court to make such modification cannot be raised or considered in a separate suit, by way of collateral attack.

3. SAME—ESTOPPEL TO QUESTION REGULARITY.
   Where the plaintiff, in a suit for partition, at a subsequent term obtained a modification of the decree as to the time and manner of sale of the property, neither he nor his successors in interest can question the regularity of the proceedings resulting in such modification.

4. JUDICIAL SALE—IMPEACHMENT—INADEQUACY OF PRICE.
   In a suit for partition of mining property, a decree was entered directing the sale of the property, and fixing an upset price of $200,000. The mine had in former years been a large producer, and was still being worked and paying dividends. No sale having been made, the decree was subsequently modified by reducing the limit to $75,000, and still later by removing it entirely, and the property was finally sold for $4,500, and the sale confirmed without objection. At this time the working of the mine had been abandoned as unprofitable, and it was filled with water. It also appeared that all the levels which had been opened had been worked out, and the future value of the property was entirely speculative. Held that, under such circumstances, the higher values previously placed on the property by the court were insufficient to show that the price realized was so inadequate as to render the sale invalid, and subject to collateral impeachment for that reason, in the absence of any other evidence showing fraud.

Appeal from the Circuit Court of the United States for the Central Division of the District of Idaho.

The appellee brought suit in equity in the court below on June 2, 1897, to quiet the title to certain mining property commonly known as the "Gold Hill Mines," situated in Boise county, Idaho. The appellant answered the bill of complaint, and filed a cross bill, praying that a decree in a partition suit entered in the district court of the Second judicial district in the state of Idaho, on the 16th day of November, 1895, and the sale of the property pursuant to such decree to the grantor of the appellee, on the 26th day of June, 1896, be declared wholly void and of no effect. The circuit court heard the case upon the merits, and dismissed the action. It appears that on the 22d day of December, 1887, D. E. Coughanour, William A. Coughanour, and Thomas Mootry, Jr., were tenants in common of the property the title of which is in controversy in this action. Thomas Mootry then brought an action in the district court of the Second judicial district, in the county of Boise, in what was at that time the territory of Idaho. The object of the action was a partition of the property, and such proceedings were thereupon had that on the 5th day of May, 1890, a decree was entered in the district court providing for a sale of the property by a referee for a sum not less than $200,000. The decree also provided that a deed should be

executed and delivered to the purchaser, and, after the payment of costs and expenses, the proceeds should be distributed to the several owners. The limitation of $200,000 on the selling price of the property was qualified by a provision of the decree that it should not be sold for a less sum without the consent of all the parties to the action, and that, if a sale should not be made before the return of the order of sale, the direction and limitation of the decree should apply to any sale made under any subsequent order of sale issued in the action, unless waived by all the parties, or modified by the court upon notice to all the parties to the action. The territory of Idaho was admitted into the Union as a state on July 3, 1890. By the act of congress of that date and the constitution of the state, all cases pending in the territorial courts at the time of the admission of Idaho into the Union as a state were transferred to the corresponding state courts, to be there proceeded with in due course of law. At the time the state courts succeeded to the jurisdiction of the territorial courts no sale had been made of the property mentioned in the decree just referred to, and nothing further appears to have been done in the matter until August 14, 1894, when Thomas Mootry began a new action in partition in the Third judicial district of the state of Idaho for the county of Boise against his partners, D. E. and W. A. Coughanour. To the complaint in this action the defendants answered, and set up the decree of May 5, 1890, as a judgment in bar to the action. Thereupon the plaintiff filed an amended complaint praying for a partition of the property and for a modification of the decree of May 5, 1890. On July 19, 1895, a decree was entered upon stipulation, and by agreement of counsel in open court, and by consent of the parties to the action, providing that the property should be sold at not less than $75,000 instead of $200,000, as provided in the original decree, and providing, also, for the appointment of a new receiver or commissioner to make the sale and carry the judgment or decree into effect. On November 16, 1895, the court, on motion of the plaintiff, modified the order of July 19, 1895, so as to provide that the commissioner and receiver should proceed to sell the property as provided by law without any limitations as to price, it appearing that the property could not be sold for the price named in the order of July 19, 1895. By this decree the sale was fixed for January 11, 1896. On December 1, 1895, the plaintiff, Thomas Mootry, died, leaving his sisters Mary Mootry and Margaret Mootry sole heirs, and on the 17th day of June, 1896, Margaret Mootry died intestate, leaving Mary Mootry her heir at law. On December 27, 1895, the court made an order modifying the decree of November 16, 1895, by changing the date of sale to February 20, 1896, and providing for the publication of the notice of sale. On January 8, 1896, in accordance with the stipulation of the parties, the sale was ordered postponed to June 20, 1896. The stipulation provided, further, for the sale of certain property belonging to the Gold Hill mine, and the application of the proceeds to the payment of the debts of the Gold Hill Mining Company. On June 16, 1896, R. R. Grayson, the appellee herein, telegraphed from San Francisco to the judge of the court in which the suit was pending, as follows: "Has sale of Golden Mine been postponed? If not, I will have an agent on 20th to make bid. Answer immediately, giving full particulars." The answer to this telegram does not appear in the record, but on the following day Grayson sent a second dispatch, as follows: "Your message received too late to leave to-day. I will leave to-morrow for Idaho. Postpone sale, if possible, until June 24th. Answer immediately." On June 18, 1896, the court, on motion of counsel for defendants, made an order reciting that "it appearing to the satisfaction of the court, from two telegrams offered in support of said motion, that it is to the best interests of the parties to this action that said sale be postponed, ordered that the sale heretofore ordered to be made by the receiver in this action on the 20th instant be, and the same is hereby, continued and postponed until the 24th instant, at one o'clock p. m." A notice of the change of the date of sale was ordered published in the Idaho World. In accordance with the terms of the decree as modified and the notice of sale, the receiver offered the property for sale at the time mentioned. The highest bid of the appellee was $10,000. D. E. Coughanour, one of the defendants in the suit, bid $15,000, whereupon

the property was declared sold to the latter. The decree for sale, and the receiver's notice of the sale, required that the property should be sold "to the highest and best bidder for cash, lawful money of the United States." The purchaser was not able to pay cash. He testifies that he told the judge that he wanted 48 hours in which to go down to Boise and get the money and pay for it, and that Hawley, his attorney, gave him 15 minutes in which to raise the money. Judge Richards, who was the presiding judge of the district court in which the action was pending, testifies: "The court took a recess pending the time the sale was being made, and when the property was knocked down I walked back into the court room. Mr. Coughanour immediately came in, and stated that he must have thirty days' time in which to make the payment on his bid. I told him I could not consider any application made in that way; that the receiver was ordered to sell the property to the highest bidder for cash. I stated, further, that I had no doubt that, if he would make such a payment as would show his good faith, a proper order could be made for an extension of time on the balance. He said he did not have a dollar. I informed him then that I could do nothing further than to require the receiver to comply with the order, and sell the property, but before anything was done I would send for his counsel, Mr. Hawley, so he could advise Mr. Coughanour as to what his rights were. This ended my conversation with Mr. Coughanour. * * * I sent the sheriff for Mr. Hawley, who was his counsel of record. In a few minutes he came in, and I explained the matter to him as I have previously stated in my conversation with Mr. Coughanour, and informed him that unless he had some good reason to show why the order of sale should not be complied with I would direct the receiver to obey that order at once. Mr. Hawley said that he thought the court was perfectly right, and he had nothing to ask, and thereupon I directed the receiver to comply with the order of sale." The receiver, in his report of the sale to the court, referring to this transaction, says: "Upon demanding the money for the sale, Mr. Coughanour said that he did not have the money, but would try to raise it in a few days." No further action appears to have been taken by Coughanour to complete the purchase of the property, and accordingly, on the same day, and shortly after this attempted sale, the property was again offered for sale, and sold for the sum of $4,500 to A. H. Boomer, who was the only bidder. On the same day the receiver conveyed the property to Boomer, and on the next day Boomer conveyed the property to Grayson, the appellee. The purchase price of the property was paid to the receiver by R. R. Grayson, the appellee, who thereafter, on the 30th day of December, 1896, made application to the United States government for a United States patent for the several mining claims included in said property, and on July 10, 1897, patents were issued to him accordingly. For the purpose of quieting the title thus acquired by the appellee, the present action was commenced.

Andros & Frank, for appellant.
W. E. Borah, John Garber, and Joseph B. Garber, for appellee.

Before GILBERT and MORROW, Circuit Judges, and HAWLEY, District Judge.

MORROW, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

It is contended on behalf of the appellant that the circuit court erred in finding that the district court of the Third judicial district of Idaho had jurisdiction to make and enter the decree and order of sale of November 16, 1895. This contention is based upon the claim that the decree of the district court of May 5, 1890, was a final decree, and before it had been modified in any way the term of the court had expired. It does not appear necessary to determine whether

this decree as a whole was final or interlocutory. It may have been final in determining the right of the plaintiff to have a partition of the property. It may have been final, also, in adjudicating upon the question as to the respective shares of the co-tenants in the property, but it was not final as to the execution of the decree. The interlocutory character of this part of the decree is fully established by its terms. It provides that certain property shall be reserved from sale, and the remainder sold as one lot or parcel, for a sum of not less than $200,000; but it also expressly provides for a modification of the direction and limitation of the decree upon the order of sale by waiver of such conditions by the parties to the action, or by order of court upon notice to all the parties. The order of the court of July 19, 1895, appointing a receiver and modifying the decree of May 5, 1890, so as to provide for the sale of the property for a sum not less than $75,000 instead of $200,000, was made in open court upon stipulation and by agreement of counsel and by consent of the parties to the action. The decree for sale entered by the court on November 16, 1895, modifying the previous decree so as to provide for the sale of the property without any limitation as to price, was made upon the motion of the plaintiff, and the decree recites that the defendants appeared by their counsel; that the parties to the suit may become purchasers at the sale; that certain surface ground be reserved to one of the defendants; and that, all parties consenting thereto, the property and premises described shall be sold together as one lot or parcel.

From these recitals it sufficiently appears that the modifications of the original decree were made by the court upon notice to all the parties to the action, and by a reasonable inference it further appears that the direction and limitation of the original decree with respect to the order of sale were waived by the parties, and the orders of July 19, 1895, and November 16, 1895, entered by consent. But, as the consent of the parties to the action cannot give the court jurisdiction of a case that is otherwise without its jurisdiction, the recitals in the modifying orders or decrees in this behalf are only material with respect to the question of jurisdiction, as showing that the modifying orders were made and entered in conformity with, and in execution of, the original decree.

In Turner v. Railway Co., 8 Biss. 380, 24 Fed. Cas. 367 (No. 14,259), original decrees were entered in a foreclosure suit in the circuit court of the United States for the Southern district of Illinois, and in the circuit court of the district of Indiana, directing the master in chancery in each of the courts to sell the main line of the Indianapolis, Bloomington & Western Railway Company, extending from Indianapolis, in the state of Indiana, to Pekin, on the Illinois river, in the state of Illinois. In May, 1878, these decrees were amended by the circuit court, and the sale of the road made in October, 1878. Among the exceptions taken to the proceedings leading up to the sale of the property was the objection that the court had no authority to amend its decree after the term of the court had expired in which the original decree was entered. The circuit judge disposed of this objection in the following language:

"The facts were that the original decree was entered on the 18th of July, 1877, and the amendment was made in May, 1878. I admit the rule which denies the power of the court over a decree after the term when it was rendered. It cannot change or alter the essential parts of the decree. But what was the order made by the court in May, 1878? It is termed a further direction for the execution of the decree theretofore entered. The original decree provided that the property should be sold on a certain number of days' publication. That was changed by the amendment. The original decree provided for the distribution of the funds arising from the sale in a particular manner. That was changed by the amendment of May, 1878. But these things did not affect the substance of the decree. Of the right of the court to make that order, I cannot doubt."

An appeal from the final order confirming the sale in this case was taken to the supreme court of the United States, where the order of sale, under the directions of the amended decree, was affirmed. Mr. Justice Harlan, in rendering the decision of the court, refers to the questions that may be considered upon such an appeal. He says:

"Appellants elected not to appeal from the final decree, although it necessarily involved every question affecting the jurisdiction of the circuit court. That decree is consequently not before us for any purpose, except to ascertain from an inspection thereof whether the sale was conducted in conformity with its provisions. In such cases, upon an appeal, not from the final decree, but only from one in execution thereof, the court will not examine the record prior to such decree, * * * but will assume that the final decree being passed by a court of general jurisdiction, and not showing upon its face a want of jurisdiction as to subject-matter or parties, was within the power of the court to render. Whether the order confirming the sale would have been erroneous had the decree itself disclosed affirmatively a want of jurisdiction is a question which need not be decided."

The learned judge then refers to the assignments of error, and, among others, to the objection that the circuit court had amended its decree after the expiration of the term in which it was entered. With respect to this and certain other objections, he says:

"We do not stop to consider whether these objections find any support in the record, since it is sufficient to say that, if any such errors exist, they necessarily inhere, some in the final decree of foreclosure and sale, and others in the orders which preceded it. They cannot be examined upon an appeal merely from the order confirming the report of sale. Our authority extends, as we have shown, no further than to an examination of the exceptions filed by appellants to the report of sale, from the order confirming which this appeal is taken. And some of these exceptions plainly have reference, not to the sale itself, but to the final decree of foreclosure, such, for instance, as that the terms of sale were too onerous; that the property was sold subject to various claims, the amount of which was wholly uncertain; and that the court had no jurisdiction in the case." Turner v. Trust Co., 106 U. S. 552, 556, 557, 1 Sup. Ct. 523, 27 L. Ed. 275.

While this decision does not directly determine the question of the jurisdiction of the circuit court to proceed at a subsequent term of the court to modify an original decree by way of an amendment providing further directions for its execution, nevertheless such a jurisdiction is necessarily implied when the court, under the circumstances, declares that a final decree passed by a court of general jurisdiction, and not showing upon its face a want of jurisdiction as to the subject-matter or parties, will be presumed to be within the power of the court to render. In the present case no lack of jurisdiction as to the subject-matter or with respect to the parties to the

action appears upon the face of the original or modified decree. It would therefore be assumed, upon an appeal from an order confirming a sale of property, that the court had the authority to make the decree; and, by analogy, this rule would obtain where the question of jurisdiction is raised by collateral attack. If the supreme court would not, upon an appeal from an order confirming the sale of property, consider an objection touching the jurisdiction of the court to modify an order of sale, but would assume that such jurisdiction existed when the contrary does not appear in the subject-matter of the suit or the citizenship of the parties, it is clear that in another suit such an objection cannot be sustained nor urged in a collateral attack upon the decree of sale.

The case of Farmers' Loan Co. v. Oregon Pac. R. Co., 28 Or. 44, 40 Pac. 1089, was also an appeal from an order confirming a sale of railway franchises and property in proceedings for the foreclosure of a mortgage. A decree entered in the case for the sale of the property on April 27, 1891, was set aside, and a resale ordered. Subsequently, and from time to time, a number of sales were ordered, with modified conditions, and these orders were in turn set aside, until finally, on October 24, 1894, the last order of sale was set aside, and a resale ordered, under terms involving substantial departures from the original decree of April 27, 1891. It was objected, among other things, that the court had no power to change, modify, or vary the original decree after the expiration of the term at which it was rendered. The supreme court held, in affirming the decree of the lower court, that a court, having acquired jurisdiction to enter a final decree, possesses the inherent right to subsequently modify both the time and manner of its enforcement. In further support of this rule, see Monkhouse v. Corporation of Bedford, 17 Ves. 380; Edwards v. Cunliffe, 1 Madd. 287; Dawes v. Thomas, 4 Gill, 333; Spann v. Spann, 2 Hill, Eq. 152; Baird v. Shepherd, 2 Ohio, 261; Malone v. Marriott, 64 Ala. 486; Cochran v. Miller, 74 Ala. 50; Bound v. Railroad Co. (C. C.) 55 Fed. 186. These cases establish the doctrine that although the court has no power to amend, modify, or alter the principles of a final decree, after the expiration of the term at which it was rendered, it nevertheless retains the inherent right to modify by a subsequent order the time of its enforcement, or the manner in which it shall be enforced. 5 Enc. Pl. & Prac. 1057.

As this was all that was accomplished or intended to be accomplished by the decree of sale of November 16, 1895, it must be held that the decree was within the jurisdiction of the court. The fact that this decree repeated the provisions of the decree of May 5, 1890, determining the right of the plaintiff to have a partition of the property and the shares of the co-tenants therein, did not in any way change the character of the later decree. The decree for sale recites that it is made upon the motion of the plaintiff for a modification of the order and decree previously made. The modification consists in the order of sale, and extends to no other matter. The repetition of other parts of the previous decree must therefore be treated as mere recitals, introducing matter from the former decree upon which the order of sale is based.

The further objection that the modified decree was secured by proceedings in a separate action appears to be without substantial merit. The original decree provided for its modification upon notice to all the parties. The new action in the same court was such a notice, and, while the usual notice in the original action would probably have been sufficient, it does not follow that it was the only notice that would bind the parties to the proceedings. But a conclusive answer to this objection is found in the fact that the plaintiff in the second action, as well as in the first, was Thomas Mootry. He was the moving party in the partition proceedings. He it was who brought his co-tenants into court to answer the second as well as the first cause of action; and it was upon his motion that the decrees of July 19, 1895, and November 16, 1895, were entered. The appellant, who has succeeded to his interests in the property, is therefore not in a position to urge an objection to the method adopted by her predecessor in interest in securing a modification of the decree of May 5, 1890.

It is next contended that the court below should have set aside the sale of the property because of the gross inadequacy of the price for which it was sold, together with circumstances attending the sale which rendered it inequitable for the court to allow the transaction to succeed. In support of the claim that the property was sold for an inadequate price, appellant refers to certain items contained in a statement prepared by, or at the instance of, W. A. Coughanour, and sent to the appellee, Grayson, in March, 1896. The items referred to are that the Gold Hill lode alone produced bullion valued at nearly $1,125,000, and paid dividends amounting to nearly $300,000. But appellant omits to mention that this yield was between the years 1869 and 1884. Appellant also states that the Pioneer mine during a period of eight months produced $48,000. This statement appears to refer to a period between December 26, 1888, and August 3, 1889, when 5,620 tons of ore were extracted from the 250-foot level of the Pioneer mine, yielding $48,483, or an average of $8.63 per ton. From the statement of Coughanour, it appears that the last dividend paid from the working of the Pioneer mine was in April, 1892. From 1892 to September, 1895, the mine was worked, but no dividends paid, and the mine was closed in September, 1895. From the testimony of W. A. Coughanour, it appears that both the Gold Hill and Pioneer mines were worked out down to the 400-foot level. He says:

"I was superintendent of the mill and mine nearly fifteen years, and am thoroughly familiar with every foot of the workings of the Gold Hill mine, from the surface to the lowest level, and that every body of ore known to myself, that we considered would pay, was worked out in that 400-foot level, or lowest level. Was not so familiar with the workings of the Pioneer mine, but from frequent visits to the mine, and going through it, from what I could learn from observation and the information I could learn from our foreman, Mr. Frame, and others, there was no other ore bodies in that mine to the 400 or lowest level that would justify working at a profit. Q. What would be necessary in order to determine whether or not there were any ore bodies there of value, yet? A. It would be necessary to procure pumps,—additional pumps,—hoisting cables, hoisting engines, and other material for drying the mine, and sinking another level of at least 200 feet, and the running of from 200 to 300 feet of hard rock tunnel, to ascertain if any ore bodies of

profit existed at that depth, and to meet this it would require an outlay of at least $30,000. I mean by this that that would be the smallest outlay in labor and the necessary machinery to get to that depth. Q. Was there at the time of the sale any means by which you could determine whether or not there were any ore bodies in those mines of any value, other than the means which you have intimated or suggested in your former answer? A. None known to me. Q. What would you say with reference to placing a value upon that mine at the time of the sale, with reference to any degree of certainty as to the correctness of the value which you would place on it? A. There could be no estimate placed upon the mine with any degree of certainty. Q. Then, as I understand, the value of the mine would be speculative, and dependent upon what future developments would show? A. Entirely, as to the real value."

The fact that the property was productive prior to 1892 does not establish its real value in 1895, after the mine had closed down, because it had then ceased to be productive. The testimony of the superintendent of the mine was that in 1895 the productive veins of the mine had been worked out down to the 400-foot level. There were no ore reserves left in the mine, and, while there may have been some speculative value in the possible discovery of ore bodies at lower depths, this uncertain speculative value was not sufficient to justify a court in setting aside a sale for inadequacy of price.

The appellant further directs attention to the fact that the upset price in the decree of May 5, 1890, was $200,000. This high limit is explained by the fact that the mine was then a dividend paying property; that is to say, a dividend had recently been paid from or taken from the Pioneer mine. At that time a limit of $200,000 on the selling price of the property was perhaps justified. The upset price of $75,000 in the amended decree of July 19, 1895, is also explained by the fact that the mine was at that time still in operation, and, although not paying dividends, some ore was being taken out. But when the mine was sold on June 24, 1896, the mine was closed down and filled with water, and it was estimated that an expenditure of $10,000 would be required to pump it out. It is evident that, under the circumstances, the limit of price fixed by the decrees of May 5, 1890, and July 19, 1895, furnish no measure of value for the day of sale. But the fact that there was no sale of the property shows that it was overvalued, even under the then existing favorable conditions. The appellant refers to the fact that in the amended complaint the appellee, as complainant, alleges that the value of the mining claims and premises was upwards of $10,000. The allegation appears to have been made for the purpose of showing that the amount in dispute exceeded $2,000, exclusive of interest and costs, the amount required to give the court jurisdiction. The original complaint had been defective in this respect, in alleging that the value of the property was upwards of $1,000. But the amended complaint was filed in July, 1897, or more than a year after the sale, and, whatever may have been the purpose of the allegation, it is evident that it had no reference to the question of value in June, 1896.

The attention of the court is also called to the fact that the appellee declared prior to the sale that he thought that he could buy the property at the sale for $10,000, and it appears that at the first offer of the property by the receiver on the day of sale the appellee

did in fact bid $10,000, and that D. E. Coughanour at that time bid $15,000; that upon the second offer of the property by the receiver one Boomer, acting for the appellee, bought it for $4,500. The appellee testifies very distinctly that his bid for the mine was a "gamble." The mine had been closed down for some time, and was full of water, and whether the property had any value at all was a matter of specu- lation. He had, however, secured $10,000, and was willing to risk that amount in the purchase of the mine, upon the possibility of find- ing ore deposits below the 400-foot level. This was a speculative opinion, which may have been sufficient to influence a young man who had capital at his command, but it is hardly sufficient to fix the value of the property for judicial purposes. The bid of D. E. Coughanour does not appear to have any greater significance. He was one of the owners of the mine. He had an interest of nearly one-half, or more than that of either of his two partners. He had been an owner since 1867. He and his partners had been seeking a purchaser since 1890, and from November 16, 1895, to June 24, 1896, the property was for sale without any limit as to the price. The sale was postponed a number of times to secure a purchaser. Finally the appellee appeared on the ground, and when the property was offered for sale by the receiver he bid $5,000. D. E. Coughanour was his only competitive bidder, and after one or two intermediate bids the latter bid $15,000, and the property was struck off to him. But he was not in a position to pay for the property in cash, although, as one of the parties to the partition proceedings, he must have known that this was a condition of the sale, and he should have been pre- pared to make his bid good by a cash payment. If the property had been worth the amount of his bid, is there any reasonable doubt but that he would have been ready to comply with the terms of the sale? There can be but one answer to this question. He was the principal owner of the property. He knew its value. He was willing to bid against a prospective purchaser to secure the best price possible, but he was not willing to become a purchaser himself. His testimony that the Gold Hill mine alone was worth $500,000 on the day of sale discloses his remarkable attitude towards the property. According to this valuation, his own interest in that mine was worth $220,000, and he would have the court believe that he sacrificed his interest on the day of sale because he was not able to make good his own bid of $15,000 for the whole property. Manifestly, testimony of this character cannot be relied upon for the purpose of ascertaining the value of the property. Two witnesses testifying on behalf of the ap- pellant valued the machinery and improvements at $30,000, but the receiver and W. A. Coughanour testified that the machinery was in poor condition, and some parts of it entirely worn out. The fact that the value of a large part of the machinery and improvements was dependent upon the value of the ore in the mine indicates that the value of this property was also uncertain. This testimony cer- tainly does not establish a value for the property which enables the court to say that it was sold for a price so inadequate as to shock the conscience and amount to proof of fraud. But the appellant re- lies upon alleged irregularity in the proceedings for partition lead-

ing up to the decree for sale, and also irregularity in the proceedings at the sale, as contributing to the claim that fairness of the whole transaction has been impeached, and justifies the interposition of a court of equity. The modifications of the decree are again referred to by the appellant as circumstances connected with the sale, to be considered in this connection, but we find nothing in that aspect of the proceedings requiring further comment, nor do we find anything in the proceedings at the sale to justify the court in determining that the conduct of the appellee was fraudulent, or resulted in the taking of an unfair advantage of the appellant's interests. When D. E. Coughanour failed to make good his bid of $15,000 for the property, the matter was immediately taken before the court which was in session for the very purpose of carrying the sale to a completion. Coughanour being unable to furnish evidence of his good faith as a purchaser, the court directed that the property should again be offered for sale by the receiver, which was done, when Boomer bid $4,500, and his bid was accepted. This was a judicial sale, and all these proceedings were taken within an hour, and afterwards confirmed by the court without objection or protest.

This view of the facts of the case renders it unnecessary to discuss the question as to how far the proceedings in partition, and the sale made in pursuance thereof, are open to collateral attack in this action. The decree confirming the sale was rendered by a competent tribunal, having jurisdiction of the parties and the subject-matter, and, upon the facts presented in this record, that decree is binding upon the parties to this action. The decree of the circuit court is reversed, with instructions to dismiss the appellant's cross bill, and enter a decree in favor of the appellee, quieting his title to the property described in the bill of complaint.